IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs February 22, 2022

## STATE OF TENNESSEE v. JAMES ARTHUR EVANS

**Appeal from the Circuit Court for Bledsoe County**
**No. 2019-CR-27     J. Curtis Smith, Judge**

_____

### No. E2021-00512-CCA-R3-CD

_____

A Bledsoe County jury convicted the Defendant, James Arthur Evans, of resisting arrest, a Class B misdemeanor.  The trial court sentenced the Defendant to six months suspended to probation after service of twenty days in jail.  On appeal, the Defendant asserts that the evidence is insufficient to support his conviction.  After review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which TIMOTHY L. EASTER and JOHN W. CAMPBELL. SR., JJ., joined.

Roger D. Layne., Chattanooga, Tennessee, for the appellant, James Arthur Evans.

Herbert H. Slatery III, Attorney General and Reporter; Rachel C. Bowen, Assistant Attorney General; J. Michael Taylor, District Attorney General; and David L. Shinn, Jr. Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION
### I. Facts

This case arises from the Defendant's disorderly conduct during Bledsoe County Sheriff's Department deputies' investigation of a reported domestic assault.  Based upon the Defendant's conduct, a Bledsoe County grand jury indicted the Defendant for domestic assault and resisting arrest.

At trial the parties presented the following evidence: The Defendant's daughter, Desiree Evans, testified that, after her grandparents died in May 2018, she moved into their residence.  She lived there for two or three months with her one-year-old son before the Defendant moved in with them.  On the night of August 22, 2018, the Defendant came

home from work at around 10:00 p.m. Ms. Evans was in her bedroom having just gotten the baby to sleep. The Defendant appeared to be intoxicated and was slamming doors, cursing, and banging pans as he prepared dinner. Ms. Evans stepped out of the bedroom to ask the Defendant not to wake the baby, but the Defendant continued calling the victim names, angry that she had not prepared dinner.

At some point, the Defendant entered the bedroom. Ms. Evans begged the Defendant "to stop" because he was scaring the baby. Ms. Evans was holding the baby, who was now awake, and trying to soothe him. The baby was screaming, and the Defendant failed to acquiesce to Ms. Evans's pleas to stop, so she began preparing to leave. When she told the Defendant she would leave, the Defendant responded that he "didn't care" and "to get off his f**king property." In the course of this interaction, he hit Ms. Evans with a phone, leaving a mark on her face. Ms. Evans was unclear on whether this action was intentional or unintentional but indicated that the contact left a mark on her face. Ms. Evans finished getting the baby ready while the Defendant "scream[ed] the whole time." She then left the residence without her shoes or her cell phone.

Ms. Evans walked across the street to her aunt's residence. She realized that she did not have her car keys but knew that she could not return home with the Defendant still at the residence. Ms. Evans called the Bledsoe County Sheriff's Department for help. She met with Pikeville City Police Department Officer Ricky Hodge and showed him a video recording of her interaction with the Defendant. She described herself as shocked and scared as she spoke with Officer Hodge.

Bledsoe County Sheriff's Department Deputy Chase Roberts assisted Officer Hodge in investigating a domestic disturbance involving the Defendant. Deputy Roberts did not speak with Ms. Evans but observed her crying as she spoke with Officer Hodge at the Sheriff's Department. After Officer Hodge finished speaking with Ms. Evans, Deputy Roberts followed Officer Hodge in his patrol car to the residence. As he and Officer Hodge walked toward the residence, the Defendant came out on the porch and asked, in an aggressive manner, what the men were doing there. Officer Hodge attempted to discuss the allegations with the Defendant, but the Defendant repeatedly yelled at the officers to "get the [f] off his property."

Deputy Roberts recalled that, at some point, the Defendant attempted to return inside his residence. Officer Hodge took out his taser and ordered the Defendant to remain on the porch. Deputy Roberts described the Defendant as "very belligerent" and that they could not "get anything out of [the Defendant] other than him just cussing us." When Officer Hodge displayed his taser, the Defendant said, "Effing shoot me." Officer Hodge put his taser away and then moved to "grab ahold" of the Defendant. The Defendant jerked and pulled away from Officer Hodge. Deputy Roberts then attempted to take the

Defendant's other arm to place him under arrest. During his interaction with the Defendant, Deputy Roberts smelled a strong odor of alcohol on the Defendant. The Defendant "kept fighting" the officers, pulling his arms away and kicking. Officer Hodge placed the Defendant on the ground where the two officers were, after "a short struggle," able to handcuff him. He described the Defendant as trying to prevent him from putting the handcuffs on.

After the Defendant was handcuffed, he complained of leg pain. Officer Hodge requested Emergency Medical Services ("EMS") to assess whether any treatment was needed for the Defendant. Once EMS arrived, the Defendant continued cussing and screaming, but he no longer attempted to kick anyone. The Emergency Medical Technicians ("EMT") transported the Defendant for medical treatment.

Brandon Whaley, who worked as a Bledsoe County EMT in August 2018, responded to the Defendant's residence to treat, what appeared to be, a dislocated ankle.[1] He described the Defendant as "fairly agitated" toward the officers. Mr. Whaley recalled the Defendant yelling at the officers while he treated the Defendant. Based upon his experience, Mr. Whaley believed the Defendant was intoxicated.

Officer Hodge testified that he met with Ms. Evans in the Sheriff's Department parking lot. He described Ms. Evans as scared, nervous, crying, and very upset. Officer Hodge did not see any marks on her face due to the lighting in the parking lot area. He also noted that she had been crying causing her face to become red and blotchy and thus difficult for him to discern a mark on her face. In the parking lot, he watched a video recording that Ms. Evans produced showing the altercation with the Defendant. Officer Hodge took a written statement from Ms. Evans and then drove the short distance to the Defendant's residence.

Officer Hodge requested a back-up officer due to the dangerous nature of domestic assault investigations. Deputy Roberts arrived at the residence at the same time as Officer Hodge. As Officer Hodge approached the residence, the Defendant stepped out onto the porch. Officer Hodge asked the Defendant "What's going on tonight?" and the Defendant loudly responded "what the eff [you] doing on [my] property?" Officer Hodge attempted to elicit the Defendant's "side of the story," but the Defendant was "irate." In light of the video, Ms. Evans's statement, and the Defendant's behavior in the presence of the officers, Officer Hodge determined the Defendant was the primary aggressor in relation to the

---

[1] Throughout the trial, different witnesses referred to the Defendant's injuries as either a dislocation or a break. The Defendant referred to his injury at times during his testimony as a dislocation and at other times as a "break." As the record is not clear on the correct diagnosis for the injury, we refer to the injury consistent with each witnesses' testimony.

domestic assault. Officer Hodge advised the Defendant he was under arrest. Additionally, Officer Hodge noted that the Defendant was engaging in disorderly conduct.

In response to Officer Hodge telling the Defendant he was under arrest, the Defendant tried to go back inside his home. Officer Hodge went up the steps to the porch, drew his taser, and instructed the Defendant to stay on the porch. The Defendant stopped, Officer Hodge holstered his taser, and the Defendant moved back toward the door. Officer Hodge ordered the Defendant to put his hands behind his back and took hold of one of the Defendant's arms. The Defendant jerked away from Officer Hodge, and Deputy Roberts took hold of the Defendant's other arm. The Defendant struggled, and the officers placed him on the ground. The Defendant was pulling his arms away from the officers, kicking, yelling, and cursing. Officer Hodge described the incident as "a pretty good struggle." Even after the officers were able to handcuff the Defendant, he continued to twist and turn and roll over. At some point the Defendant stated that the officers had hurt his leg. Officer Hodge observed an injury to the Defendant's leg and called for medical assistance before moving the Defendant to a chair to better protect the injured area. Officer Hodge believed that the Defendant was intoxicated.

The State rested its case-in-chief and the defense presented the following evidence: Tammy Cagle, the Defendant's sister, lived approximately a block from the Defendant at the time of these events. Shortly before 11:00 p.m. on the night of August 22, 2018, Ms. Cagle observed police officers at the Defendant's residence. Earlier that night, at around 10:00 p.m., her niece, Ms. Evans, had come over to Ms. Cagle's residence and was very angry. Ms. Evans remained at Ms. Cagle's house for approximately twenty-five minutes. Ms. Evans showed Ms. Cagle a video of her interaction with the Defendant. Ms. Cagle testified that she did not see the Defendant hit Ms. Evans on the video recording nor did she see any injury to Ms. Evans face. Ms. Cagle watched Ms. Evans's baby that night while Ms. Evans was away for approximately forty-five minutes.

Upon seeing the police at the Defendant's residence, Ms. Cagle drove over to the residence. Initially she believed the Defendant was hurt, and the officers were helping the Defendant. Ms. Cagle could tell the Defendant was in pain and told the officers, "[Y'all] broke his damn leg," and Officer Hodge put her in handcuffs. Ms. Cagle never saw the Defendant struggle against the officers or heard him curse at the officers.

On cross-examination, Ms. Cagle denied that the officers asked her repeatedly to get off the porch of the Defendant's residence. She maintained that Officer Hodge put her in handcuffs because she said "damn." She stated that she spoke to the Defendant while he was handcuffed and lying on the porch. She said that he was not drunk. She also spoke with him after they loaded him in the ambulance and at the hospital. She maintained that there were no indicators of intoxication.

4

The Defendant testified that after he got off work at the Dollar General at about 8:30 p.m., he drank two twenty-four ounce beers with his brother-in-law before going home. When the Defendant arrived home at 10:15 or 10:30 p.m., all of the lights were on and the doors were propped open. He went inside to find Ms. Evans in the kitchen. He told Ms. Evans not to run the air conditioning with the doors open, and his admonishment made her mad. Ms. Evans retorted that she would do whatever she wanted to do. This exchange developed into "a pretty good argument" during which he told Ms. Evan she needed to find a job and a place to live. Ms. Evans "smacked" the Defendant twice and told him she was not going anywhere before going to her bedroom. The Defendant followed, angry that he had been hit, and opened the bedroom door. When he entered, Ms. Evans was recording him on her phone. He attempted to grab the phone from her hand, and the phone fell to the floor. Ms. Evans left the residence and drove to Ms. Cagle's residence. As she left, she said, "You're going [to] jail, bitch." The Defendant denied hitting Ms. Evans.

After Ms. Evans left, the Defendant walked to the store and bought cigarettes. When he returned, he prepared dinner and ate. He was beginning to clean up when he heard the neighbor's dogs barking. He stepped outside and saw Officer Hodge and Deputy Roberts "coming up the alley." Officer Hodge asked "what was going on[?]" and the Defendant replied, "Nothing's going on. What's going on with you?" He discussed with the officers the argument with Ms. Evans, but when the officers accused him of lying, he asked them to leave his property. Instead of leaving, Officer Hodge walked onto the porch and told the Defendant he was going to jail. Deputy Roberts kicked the Defendant in the leg, knocking him back into Officer Hodge, who "tased" the Defendant and then slammed the Defendant to the ground.

The Defendant denied trying to flee at any time. As he laid on the ground, he tried to pull his leg out from under Deputy Roberts, and Deputy Roberts gave "it a good twist, which dislocate[d] it." The Defendant denied resisting while he was being handcuffed, explaining he was in pain. The officers pulled him up off the ground and sat him in a chair.

The State inquired about the "boot" that the Defendant was wearing, and the Defendant explaining that he wore it off and on when he experienced pain. The Defendant stated that he walked with a limp since this incident with the officers.

The State called Pikeville Chief of Police Ronald Byrd as a rebuttal witness. Chief Byrd testified that he had known the Defendant for a long time and saw him frequently "out and about." He had last seen the Defendant a month before at the Gulf gas station. He saw the Defendant exit his vehicle and walk inside the gas station. The Defendant was not wearing a "boot" or limping. Chief Byrd recalled seeing the Defendant five or six

times throughout the past year and every time the Defendant was neither wearing a "boot" nor limping.

After hearing this evidence, the jury convicted the Defendant of resisting arrest, a Class A misdemeanor. The jury acquitted the Defendant on the domestic assault charge. The trial court sentenced the Defendant to six months suspended to probation after service of twenty days in jail. It is from this judgment that the Defendant appeals.

## II. Analysis

On appeal, the Defendant asserts that the evidence is insufficient to support his conviction for resisting arrest. The State responds that there is sufficient evidence to support the Defendant's conviction. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony

of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

The Tennessee Code defines the crime of resisting arrest as occurring when "a person . . . intentionally prevent[s] or obstruct[s] anyone known to the person to be a law enforcement officer . . . from effecting a stop, frisk, halt, arrest, or search of any person, including the defendant, by using force against the law enforcement officer or another." T.C.A. § 39-16-602 (2018). In this case, viewed in the light most favorable to the State, the evidence proved that the Defendant belligerently met officers who were legitimately investigating an alleged domestic assault. He cursed at the officers, unwilling to cooperate in the investigation, and ordered them off his property before attempting to re-enter his residence. When Officer Hodge told the Defendant he was under arrest, the Defendant pulled away from the officer's hold. Deputy Roberts attempted to assist and the Defendant pulled away from the officers and began kicking at them. After a struggle, Officer Hodge handcuffed the Defendant. The Defendant continued to be belligerent and curse at the officers as testified to by both officers and an EMT called to the scene to treat the Defendant's injury. Based upon this evidence, a jury could conclude that the Defendant intentionally prevented Officer Hodge from effecting an arrest by pulling away and struggling against Officer Hodge as he tried to place handcuffs on the Defendant.

As to the Defendant's contention that the officers used excessive force, warranting his response, the evidence and testimony does not support the Defendant's assertion. The

7

officers made several attempts to hear the Defendant's "side of the story." Officer Hodge told the Defendant he was under arrest, and the Defendant physically resisted. Officer Hodge and Deputy Roberts testified that a taser gun was not used and, although the Defendant initially testified that a taser was used, during cross-examination, he testified that he was not sure whether a taser was used. He also admitted that he never showed the resulting burns to medical personnel at the hospital or photographed those injuries. The testimony indicates that the officers used the necessary force to meet the Defendant's resistance.

Accordingly, we conclude that there is sufficient evidence for a rational jury to convict the Defendant of resisting arrest; as such, the Defendant is not entitled to relief on this issue.

## III. Conclusion

After a thorough review of the record, we find that the evidence sufficiently supports the Defendant's conviction for resisting arrest. Based on the foregoing reasoning and authorities, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE

8